IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL DAVID BENSON, SR.,                Case No. 2:12-cv-01099-MA

                 Petitioner,              OPINION AND ORDER

          v.

RICK COURSEY,

                 Respondent.


ANTHONY D. BORNSTEIN
Federal Public Defender's Office
101 S.W. Main Street, Suite 1700
Portland, OR 97204

          Attorney for Petitioner

FREDERICK M. BOSS
Deputy Attorney General
NICK M. KALLSTROM
Assistant Attorney General
Department of Justice
1162 Court Street
Salem, OR 97301-4096

          Attorneys for Respondent

MARSH, Judge

          Petitioner Michael David Benson, Sr., an inmate in the

custody of the Oregon Department of Corrections, brings this habeas

1 - OPINION AND ORDER

corpus proceeding pursuant to 28 U.S.C. § 2254. Petitioner contends that the trial court violated his Sixth Amendment right to confront adverse witnesses when it admitted hearsay statements of his non-testifying co-defendant at their joint trial. For the reasons set forth below, the petition is denied.

## BACKGROUND

Early in the morning on October 28, 1998, petitioner and co-defendants Jamison Ennis and Brian Hudson went to the home of Patrick Murphy. Petitioner drove a U-Haul truck to Murphy's home, and Ennis and Hudson drove in Ennis's car. Ennis told petitioner he needed the U-Haul to retrieve property he left at Murphy's house. Murphy let them in the house, and led them into the garage, where they met Frank Perrotte, who was smoking methamphetamine. Subsequently, a conversation between Murphy and petitioner became heated, and Murphy and petitioner went inside the house and the two fought. Meanwhile, Ennis and Hudson loaded the U-Haul with various items, including guns, ammunition, and tools. Eventually, two gunshots were heard coming from inside the house. Petitioner and Hudson left Murphy's home in the U-Haul, and Ennis in his car. Perrotte left in Murphy's vehicle. Tr. 124. No one reported the shooting, and Murphy's body was not discovered by the police until December 14, 1998.

Petitioner was indicted with two counts of felony murder, charging that during the course of committing burglary or robbery,

petitioner shot and killed Patrick Murphy with a handgun, violating O.R.S. §§ 163.115(1)(b)(C), (G).    In April and May of 2000, petitioner was tried jointly with co-defendants Ennis and Hudson.

Prior to trial, co-defendant Hudson made several statements that inculpated petitioner and Ennis to police detectives and others.    The prosecution moved to admit Hudson's statements and petitioner moved to sever his trial from co-defendants Ennis and Hudson.    The trial court denied petitioner's motion to sever, and admitted Hudson's statements in redacted form and with a limiting instruction that the evidence only be considered against Hudson.[1] Hudson did not testify at their joint trial.

At trial, the prosecution's theory of the case was that Murphy owed Ennis money for drugs that Ennis had "fronted" Murphy, meaning that Ennis had supplied Murphy methamphetamine for which Murphy had not paid Ennis.    The prosecution argued that Ennis and petitioner went to Murphy's home to take property to settle the debt, or to "tax" Murphy.    Also, the state contended that Ennis and petitioner wanted to extract an apology from Murphy for offensive statements Murphy made to Ennis's girlfriend.

Petitioner testified at trial and admitted that he fought with Murphy, but contended that he shot Murphy in self-defense. Petitioner also argued that he went to Murphy's home to assist

---

[1] Additional background and information concerning the admission of the redacted statements is contained *infra.*

Ennis in recovering Ennis's property, and denied that he intended to steal Murphy's property.

## I.   Facts Established at Trial

### A.   State's Case

In its case in chief, the state called Frank Perrotte, the only eyewitness to the events on the night of Murphy's death other than the three co-defendants.   Perrotte testified that he and Murphy had been working on Murphy's car in the garage and smoking methamphetamine.   Perrotte testified that when petitioner and co-defendants arrived, petitioner got into a "heated discussion" with Murphy, and was looking for an apology that Murphy did not provide. Tr. 113.   Perrotte testified that petitioner tried to shoot Murphy with a crossbow, but it did not fire.   Tr. 111, 114.   Then, petitioner hit Murphy in the face with a phone.   Tr. 114-15. Perrotte testified that the "scuffle" between Murphy and petitioner moved into the house, and that it sounded like Murphy was being "roughed up" inside the house by petitioner.   Tr. 115.   Perrotte testified that he stayed in the garage with Ennis and Hudson.   Tr. 116.

Perrotte testified that at some point, he saw petitioner point a small handgun around and that Ennis had a large pistol.   Tr. 116, 117.   Perrotte testified that Ennis passed petitioner a roll of duct tape into the house, and that Murphy tumbled over a stove and back into the garage and that Murphy's hands were duct-taped

4 - OPINION AND ORDER

together and Murphy had bloody feet.    Tr. 118-19.    Perrotte
testified that Murphy and petitioner went back into the house where
they continued to argue.    Tr. 120.

Perrotte testified that while Murphy and petitioner fought in
the house, he remained in the garage with Ennis, who was holding a
gun.    Tr. 120.    Perrotte explained that Ennis and Hudson were
loading up Murphy's possessions such as tools, guns, ammunition,
and a small welder.    Tr. 120-21.    Perrotte testified that
petitioner told him that he had "one chance to save your friend."
Tr. 121.    Perrotte testified that he believed that petitioner
wanted him to talk to Murphy, so he went into the house and walked
down the hallway toward Murphy, who was in the back bedroom.    Tr.
122.    Perrotte testified that petitioner ran down the hallway
toward Murphy, that Murphy ran into the office, and Perrotte stated
that he returned to the garage.    Tr. 122.    Perrotte testified that
he next heard a loud sound like a door getting kicked in, and two
gunshots.    Tr. 123.

Perrotte stated that he turned to Ennis and said "I'm out of
here" then walked out.    Tr. 124.    Before leaving, Perrotte heard
Murphy say "You fucker.    You fucker.    You shot me." and call
Perrotte's name.    Perrotte testified that he did not have a gun,
and did not go inside for fear of being shot.    Perrotte testified
that he ran to Murphy's Blazer, and took off.    Tr. 124-25.
Perrotte testified that he did not report the shooting to the

police because he felt threatened by Ennis. Tr. 128. Perrotte testified that Ennis said that he knew where Perrotte lived, and that Ennis knew Perrotte had a wife and two kids. Tr. 128. Perrotte also stated that he knew Murphy owned a safe. Tr. 129.

On cross-examination, Perrotte admitted that on the first three occasions he spoke to the police, he did not provide truthful information, but later decided to tell the truth. Tr. 219. Perrotte testified that he told the police that Ruby McBride had stolen a large amount of methamphetamine from Murphy, and that McBride was paying Perrotte to keep quiet by giving him methamphetamine. Tr. 137. Perrotte admitted that he and Murphy used methamphetamine, that he consumed a couple of beers, and that he was high on the night of Murphy's death. Tr. 143-44. Perrotte admitted that he drove McBride to Murphy's home after Murphy was shot, but did not go inside the house. Perrotte also admitted to driving Murphy's Blazer for six weeks knowing that Murphy was dead, but that he was not charged with unauthorized use of a motor vehicle.

The prosecution also presented testimony from two police officers, Craig Siebel and Todd Gray, who responded to a complaint by a manager at the Quality Inn about a high volume of traffic and suspected drug activity on October 28, 1998, the same day Murphy was shot. Tr. 298, 311. Officer Gray testified that when he arrived at the motel room, he found petitioner, co-defendant Ennis,

and Christine Wilson, petitioner's girlfriend.    Tr. 300-303.
Inside the motel room, police found a shotgun with a pistol grip,
a duffle bag, long rifle, and a .22 calibur revolver.  Tr. 303-04.
Officers Gray and Siebel testified that petitioner negotiated to
consent to the search of a briefcase if personal items from his car
could be removed, including a computer, leather jacket and other
personal items.  Tr. 317, 322.  Officer Gray testified that inside
the briefcase, he located drugs, a scale and money.  Tr. 309.

Petitioner's girlfriend, Christine Wilson, testified that on
October 28, 1998, petitioner and co-defendants Ennis and Hudson
returned to the Quality Inn and changed clothes, which they put
into a duffle bag, and that Ennis then left.  Tr. 332.  Wilson
testified that she did not know where petitioner had been, but she
presumed petitioner had beat someone up.  Tr. 338.  Wilson also
testified that when petitioner returned to the motel room,
petitioner had injured his thumb and that she wrapped it with
toilet paper, and that petitioner told her the injury was caused by
a "bow and arrow or a crossbow."  Tr. 347.  Wilson denied renting
the U-Haul, but she admitted that she saw blood on petitioner's
leather jacket and that she cleaned it at petitioner's request.
Tr. 349.  On cross-examination, Wilson admitted that in October of
1998, she was using a lot of methamphetamine.  Tr. 356.

Murphy's body was discovered by a code enforcement officer
responding to a complaint about an abandoned house on December 14,

1998. At trial, the prosecution called Detective Jeff Staples, who assisted with the investigation into Murphy's death. Staples testified that Murphy's house had been ransacked and Murphy's body had been there awhile, and that he found a bullet hole, empty gun boxes and lots of ammunition. Tr. 405. Staples testified that there were blood smears on the walls, and a piece of rolled-up duct tape on the floor. Tr. 437.

The prosecution presented James Kevin Compton, petitioner's friend, who testified that on October 28, 1998, he was called by petitioner to retrieve petitioner's car from the Quality Inn, and that he unloaded the items from the car into his house, including a laptop computer, a leather jacket, and some tools. Tr. 622. Compton testified that Steve Miller eventually took the laptop, and that petitioner's mother took the leather jacket. Tr. 621. Petitioner's mother, Patricia Temple, testified that she eventually picked up all of petitioner's belongings from Compton's home. Tr. 600. Temple testified that she had initially stored some of petitioner's things at a neighbor's house, but later turned those items over to the police, including a leather jacket and a duffel bag that contained clothing that was too small for petitioner. Tr. 761-62. Forensic evidence established that the blood on petitioner's jacket was Murphy's.

Jonathan Morgan testified that he shared an apartment with Hudson and others. Tr. 646. Morgan testified that in late October

1998, he assisted Hudson in moving property from a house on Portland Road, and that he sold a number of those items to his neighbor, including a drill gun, a camera, a sword, speakers, and a television. Tr. 650. Morgan also testified that Ennis came to his house one night with a duffel bag containing guns. Tr. 644. Morgan read a statement that he gave to the police regarding what Hudson said:

> Hudson had been involved in an incident where another person had tried to shoot a person in the leg with a crossbow. The person could not get the crossbow to fire and stabbed the person in the leg with the bolt – the bolt of the crossbow. ... I believe that Brian Hudson said it was because the person owed the other person something.

Tr. 644. On cross-examination, Morgan admitted that in October of 1998, he was using methamphetamine and heroin heavily. Tr. 657.

Jon Prince testified that he was Morgan's neighbor. Tr. 666. Prince admitted that he bought items from Morgan, including a drill, a camera, a long knife, Bose speakers for $80. Tr. 666.

Wallace "Corky" Giegle testified that he met petitioner in late October 1998, and that petitioner lent him $600. Tr. 678. Giegle testified that later that same day, he received a call from petitioner, asking Giegle to meet him at the Quality Inn because petitioner had items in a U-Haul that needed to be stored for a short time. Tr. 678. Giegle testified that he and petitioner drove to his RV, which was parked at a storage facility on Portland Road, and they unloaded items from the U-Haul into his RV,

including a television, some boxes, rifles, speakers, and a small safe. Tr. 680. On cross-examination, Giegle admitted that he did not repay petitioner the $600 loan, and that he helped Ennis open the safe. Tr. 700. Giegle also admitted that in October of 1998, he was using methamphetamine on a daily basis. Tr. 709.

Deseree Rohrback testified that when Giegle was living with her family, Giegle and co-defendant Ennis used a screw driver and a hammer to force open a safe that Giegle was storing in her living room. Rohrback testified that inside the safe was jewelry and a "wad of money." Tr. 742.

The prosecution presented evidence from Joseph Jacobs, co-defendant Hudson's cellmate. Jacobs testified that on February 9, 1999, he gave a statement to Detective Mike Quakenbush. Tr. 783. Jacobs read his statement into evidence, which provided that while he shared a cell with Hudson at county jail, Hudson told Jacobs that Hudson "and others" went to a person's house to make the person apologize for "assault[ing]" two females, that "one of the persons [Hudson] was with began hitting the dude around," that "Hudson said one of the persons handed him a roll of duct tape, and Hudson demonstrated how he duct-taped the person." Tr. 785. Jacobs stated that Hudson said "one of the persons had a gun," that the victim and "the other persons" went into a bedroom, that Hudson heard two gunshots, and that they loaded some items into a vehicle and left. Tr. 785. According to the redacted statement, Hudson

told Jacobs that Hudson "thought they were just going over to teach—teach the guy some respect, but it got out of hand because of the beating." Tr. 785.

The prosecution presented testimony from Ruby McBride, Murphy's girlfriend. McBride testified that she took a large quantity of methamphetamine from Murphy. Tr. 880. McBride also testified that she knew Murphy owned a safe, and that shortly after Murphy's death, the safe was no longer at Murphy's home. Tr. 885–86.

The prosecution called Stephanie Silsby, co-defendant Hudson's girlfriend. Silsby testified that she talked to Detective Graham, but that she had no independent recollection or memory of what she said. Tr. 299. On cross-examination, Silsby admitted that at the time she gave her statement to Officer Graham, she was using methamphetamine heavily. Tr. 262, 272.

Over petitioner's attorney's objection, the prosecution was permitted to call Detective Graham to read Silsby's statement. Detective Graham testified that he interviewed Silsby on two occasions in February 1999. Graham then read the redacted statement from Silsby about what Hudson told her about the events in October 1998:

> Brian Hudson told [Silsby] that he and others went and
> taxed someone. It was real bad, and he was scared as he
> had never seen anything like it. The person who was
> taxed was duct taped or tied up. Hudson did not indicate
> who the victim was or who did the tying or duct taping.
> Brian Hudson told her that one of the other persons there

had an arrow type gun and was trying to shoot the victim
and it would not work.  The person stabbed the victim in
the leg.  Hudson said at that time during this incident
Hudson (as spoken) had a gun.  Hudson said that at one
point the victim got a hold of a gun and Hudson told one
of the other persons present.  One of the other persons
present took the gun that Hudson had, and Hudson went
into another room. . . . The other two persons were in a
room with the victim, and Hudson was in a separate room.
He and the others stole the victim's property, which
included money and drugs.  Hudson told her that they got
other merchandise that was apparently worth a lot of
money.

Tr. 958.

Detective Stoelk testified about his investigation, and that

he interviewed Hudson in February 1999.  As relevant, Detective

Stoelk read a statement made by Hudson into the record:

Brian Hudson said that he had been staying at . . .
Salishan Street with his girlfriend, Stephanie Silsby,
with a Jonathan Morgan, and with Morgan's girlfriend
named Robyn.  Hudson knows Michael Benson and Jamison
Ennis.  He attended high school with Ennis and considered
him to be a friend for some time. He met Benson only
recently.  Hudson did not know what was going to happen
when Hudson went into the house.  This occurred one day
between 3 and 5 a.m.   Hudson was at the Salishan
residence with someone named Anthony, Jonathan Morgan,
Robyn, and Stephanie Silsby.   There was a knock on the
door, and Stephanie answered the door.  Hudson went
outside.  There was a Honda car and a U-Haul truck.  The
U-Haul truck was a large one, having a storage area over
the cab.  Anthony was outside with Hudson before Hudson
left.  Hudson got into the Honda and went to Waremart and
met the U-Haul.

They went to a house. He did not know the person who
lived at the house.  At the house, the U-Haul was parked
in the driveway backing down the driveway.   Murphy
answered the door, and it was about daylight.  Murphy let
him into the house.   Hudson went into the garage.
Someone else was there.  Murphy and the other person were
smoking methamphetamine.  He did not know the other
person's name.  He watched what happened in the garage.

12 - OPINION AND ORDER

Murphy went into the house.  Hudson heard loud crashing noises and thudding noises that sounded like a body hitting the wall.  After a while, Hudson saw Murphy fall backwards into the garage, landing on the floor.  He saw Murphy get hit in the head with a handgun.  There was a large gash in Murphy's head that was bleeding quite a bit.  There was duct tape placed around the wound on Murphy's head.  Hudson, following directions by one of the other persons present, began packing up Murphy's tools.  Hudson packed them up near the garage door. Hudson moved an electrical welder next to the garage door in preparation to take it.  Hudson went inside the house to a back bedroom that appeared to serve as an office to get guns from that room.  Hudson found several guns.  One was a rifle, and one was a shotgun. . . . He removed the ammunition from all the guns and took the two long guns and a Tupperware box of ammunition to the garage.  Hudson unloaded or made sure that all the guns were unloaded. As Hudson was in the office, he saw Murphy in the bedroom. It appeared that things were calmer.  Murphy no longer had the duct tape on.  When Hudson reentered the house after carrying the guns out, Hudson saw that Murphy was in the doorway leading into the office. Hudson thought Murphy had a gun.  Hudson was handed a can of mace and told to go out in the garage and watch the guy in the garage.  Hudson then loaded the welder and the two long rifles into the U-Haul truck. . . .  While outside, Hudson heard two loud pop noises from inside the house. The other person, who had been at the house when Hudson arrived, indicated that he wanted to leave, and Hudson did nothing to stop him from doing so.  The other person left in a Chevy Blazer.  Hudson left, riding as a passenger in the U-Haul truck.  While riding in the U-Haul, one of the others handed Hudson a small black 22 automatic pistol.  Hudson went in the U-Haul to a motel . . .  The property remained in the U-Haul truck.  In the motel, Hudson, at the direction of one of the others there, removed the clip from the gun that had been handed to him in the U-Haul while leaving Murphy's house.

Chrissy Wilson was at the motel room.  Hudson, at the direction of one of the others present, removed his clothing and put it into a duffel bag.  Hudson believes that either Chrissy Wilson or Corky removed the clothing from the motel room. . . .  Hudson went to take back the U-Haul truck at about 10 a.m.  Hudson took the U-Haul truck to the distributor . . . at the direction of one of the other persons present.  Hudson dropped off the truck,

tossing the keys to the attendant at the business. A safe and guns were removed from the U-Haul before it was returned. Those items were placed in another car.

Hudson went back to his place and told Stephanie Silsby what had happened. He did not tell anyone else. Later on Hudson, at the direction of another person, went to Corky's to get some of the items that were taken there. Hudson went there and found that things had already been removed. He and another person later took some of the things from Corky but were unable to sell those things.

Tr. 1038-41.

Detective Quakenbush also interviewed co-defendant Hudson in February 1999. At trial, he read into the record a redacted statement he obtained from Hudson which stated "Murphy was beaten by one of the other persons present" and that "Murphy was stabbed in the leg with a crossbow arrow by one of the other persons present." Finally, the statement also provided that, "[a]fter the homicide, Hudson and the two others returned to the Quality Inn." Tr. 1007-08.

Detective Rawlins testified that he spoke with Hudson in March 1999, and that "Hudson was driven to Murphy's residence. At the residence, he began collecting tools and guns. Apparently Mr. Murphy was able to get a gun. [Hudson] ran outside the residence. He heard gunshots while he was outside. And then they left the residence." Tr. 1002.

## B. Defense Case

Petitioner testified in his own defense. Petitioner admitted to shooting Murphy, but contended that he did so in self-defense,

14 - OPINION AND ORDER

asserting that Murphy instigated the final altercation. Petitioner testified that he agreed to assist Ennis in retrieving property, and that they first drove to co-defendant Hudson's house because Hudson was going to help. Tr. 1358. Petitioner testified that when they arrived at Murphy's house, they went into the garage, where they met Perrotte, and that things were friendly. Tr. 1365. Petitioner testified that Murphy refused to apologize to Ennis for the statements he made to Ennis's girlfriend. Tr. 1366. Petitioner stated that he picked up crossbow and tapped Murphy on the chest and told Murphy he was "out of line for what he did" and that Murphy then pushed him. Tr. 1377. Petitioner stated that he then picked up a phone and "busted it on the shelf next to [Murphy's] head." Tr. 1377. Petitioner testified that after speaking to Perrotte, Murphy then invited petitioner inside the house. Tr. 1377. Petitioner stated that when asked why Murphy got so upset in the garage, Murphy "flipped out" and pushed petitioner. Tr. 1379. After pushing each other, Murphy swung at petitioner, and petitioner then hit Murphy, who fell over a stove and landed in the garage. Tr. 1380.

Petitioner testified that Murphy was bleeding from his forehead, and that petitioner wrapped duct tape around Murphy's head to stop the bleeding. Tr. 1381-82. Petitioner stated that Murphy then wanted to talk it out, and that once inside, he and Murphy worked things out, and smoked methamphetamine. Tr. 1387.

Petitioner stated that when he turned to look down the hallway, Murphy pulled out a gun and threatened to kill petitioner. Tr. 1391. Petitioner stated that Murphy forced him into the office, and petitioner pulled out his own gun. Petitioner stated that he grabbed Murphy's arm and shot him. Tr. 1388. Petitioner testified that as he was leaving, Murphy jumped on his back, leaving blood on his jacket. Tr. 1392-95. Petitioner testified that he then ran to the U-Haul, and drove to the Quality Inn with Hudson, and Ennis drove separately. Tr. 1392. Petitioner admitted that once at the Quality Inn, he changed his clothes and directed Ennis and Hudson to do so as well. Tr. 1395. Petitioner stated that Ennis and Hudson returned the U-Haul.

Ennis also testified in his own defense. Ennis testified that he knew Murphy and that he went to Murphy's home to retrieve his own property that Murphy was storing for him. Tr. 1429-30. Ennis testified that once in the garage at Murphy's house, petitioner and Murphy had an altercation. Tr. 1434. Ennis testified that he told Hudson to go into Murphy's house to retrieve his two rifles and a welder Ennis previously purchased from Murphy. Tr. 1437, 1442. On cross-examination, Ennis admitted that he was one of Murphy's sources of methamphetamine, and that he was disappointed that Murphy had insulted his girlfriend. Tr. 1427, 1446-47.

The court instructed the jury that Hudson's statements were not evidence against petitioner, that Hudson's statements could

only be used as evidence against Hudson, and that Hudson's statements should not be considered in their deliberations on petitioner's charges.  Tr. 1632-33.

In a unanimous verdict, the jury found petitioner guilty on both counts of felony murder with a firearm.  Resp. Ex. 101.  The trial court sentenced petitioner to 300 months imprisonment on each count of felony murder to be served consecutively, with 60 months on the first firearms charge, to be served concurrently.

## II.   Procedural Background

On direct appeal, petitioner raised five assignments of error. The state conceded that the trial court erred by failing to merge petitioner's convictions under both theories of burglary and robbery for sentencing purposes.  Resp. Ex. 111, p. 42.  On April 3, 2003, the Oregon Court of Appeals held that petitioner could not be sentenced consecutively under both theories of felony murder with one victim, and vacated the separate judgments of conviction and remanded the case for re-sentencing.  Resp. Ex. 104; *State v. Benson*, 187 Or. App. 276, 277, 66 P.3d 569, *rev. denied*, 335 Or. 655, 75 P.3d 898 (2003).  With respect to petitioner's other assignments of error, the Court of Appeals affirmed without discussion.  Petitioner filed a petition for review, seeking review of his remaining assignments of error, and the Oregon Supreme Court denied review on August 26, 2003.  Resp. Ex. 113-14.  Consistent with the Oregon Court of Appeals decision, on January 9, 2004,

17 - OPINION AND ORDER

petitioner was sentenced to 300 months on the Felony Murder conviction, and 60 months for use of a firearm, with a post-prison supervision term of life.  Ex. 101.  Petitioner did not appeal following re-sentencing.

On December 1, 2004, petitioner signed a petition for post-conviction relief ("PCR").  Resp. Ex. 106.  In the PCR proceeding, petitioner asserted various claims of ineffective assistance of counsel and ineffective assistance of appellate counsel.  The PCR court denied petitioner's petition.  The Oregon Court of Appeals affirmed without opinion, the Oregon Supreme Court denied review, and the appellate judgment issued December 27, 2011.  *Benson v. Belleque*, 242 Or. App. 682, 256 P.3d 205, *rev. denied*, 351 Or. 318 (2011); Resp. Exs. 108, 136, 140-41.

On June 19, 2012, petitioner filed this petition for habeas corpus in federal court.

## LEGAL STANDARDS

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was:  (1) "contrary to, or involved an unreasonable application of, clearly-established federal law, as determined by the Supreme Court of the United States;" or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d). The state court's findings of fact are presumed correct, and a

petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Section 2254(d) is a "'guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1148 (9th Cir. 2012)(quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011)(additional internal quotation omitted)). "'[T]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" *Id.* at 1146 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

A state court acts "contrary to" clearly-established federal law if it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if it decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

A state court decision is an "unreasonable application" of clearly-established federal law if the court: (1) identifies the correct governing legal principle from Supreme Court decisions, but unreasonably applies that principle to the facts of the prisoner's case; or (2) either unreasonably refuses to extend the governing

legal principle or unreasonably extends it to a new context where it should not apply. *Id.* at 407, 413. Under this standard of review, a federal court may not issue a writ of habeas corpus because it concludes the state court applied clearly-established federal law erroneously or incorrectly. The state court decision must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

## DISCUSSION

Respondent moves to deny relief on the basis that the petition is untimely. Petitioner responds that he is entitled to equitable tolling. In order to avoid a time-consuming evidentiary hearing on the timeliness of petitioner's claims, the court has determined it is more expeditious to resolve the merits of the petition first. Declaration of Nick M. Kallstrom (#20); *see Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)(court need not resolve procedural bars prior to addressing merits); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002)(court may reach merits of habeas petition despite asserted procedural bar if more expeditious).

Respondent moves to deny relief on petitioner's unargued claims, and contends that petitioner has procedurally defaulted the remaining claim – Ground 3 subparts (1-4). Alternatively, respondent argues that habeas relief on Ground 3 subparts (1-4) should be denied on the merits because: (1) the claim was denied in a state court decision entitled to deference; and (2) even if

20 – OPINION AND ORDER

Hudson's redacted statements were erroneously admitted, in light of the overwhelming evidence against petitioner, their admission did not have a substantial injurious effect on the jury's verdict.

I.    **Claims Not Addressed in Petitioner's Brief in Support**

Petitioner alleges five grounds for relief in his petition. In his briefing to this court, petitioner limits his argument to Ground 3, subparts (1-4), contending only that the trial court erred in denying his motion to sever and in admitting the redacted statements of co-defendant Hudson, violating the Confrontation Clause of the Sixth Amendment.    Brief in Support (#55) p. 7. Respondent moves to deny relief on petitioner's unargued claims, contending that petitioner has failed to meet his burden on Grounds 1, 2, 4, 5, and Ground 3 subpart (5).

Petitioner fails to provide argument to support Grounds 1, 2, 4, 5, and subpart (5) of Ground 3 alleged in his petition. Additionally, petitioner does not attempt to refute respondent's argument that these claims do not entitle him to habeas corpus relief.    Petitioner has failed to meet his burden on Grounds 1, 2, 4, 5, and subpart (5) of Ground 3.    *See Lambert v. Blodgett*, 393 F.3d 943, 970 n. 16 (9th Cir. 2004)(petitioner bears burden of proving his claims); *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)(same); *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002)(same).    Consequently, I deny habeas relief on these claims. ////

21 - OPINION AND ORDER

## II.  <u>Ground 3 Is Not Procedurally Defaulted</u>

In petitioner's sole remaining ground for relief – Ground 3 subparts (1-4), he alleges the following:

> <u>Ground Three:</u> Violation of U.S. Constitution, Am. VI & Am. XIV right to be confronted with the witnesses against him.
>
> <u>Supporting Facts:</u> Trial Court erred when it allowed redacted statement of non-testifying co-defendant Hudson into evidence: (1) Court should not have allowed any redacted statements of any kind; (2) Redacted statements unfairly and clearly implicated petitioner in direct contravention of Am. VI and federal *Bruton, Richarson,* and *Gray* jurisprudence; [(3)] Court allowed hearsay, and hearsay within hearsay, testimony of material witnesses opposed to Petitioner over objection; [and (4)] Court denied multiple motions to preclude[,] limit and strike and denied motion to sever Petitioner's trial from that of co-defendants[.]

Petition (#1) p. 7.

Respondent argues that to the extent that petitioner alleges that the trial court erred in the *manner* in which Hudson's statements were redacted, Ground 3 is procedurally defaulted. According to respondent, because petitioner's trial attorney Jeff Jones agreed to the specific redactions of Hudson's statements, petitioner failed to preserve the issue at trial, or alternatively, invited error.   Respondent contends that because petitioner waived his Confrontation Clause objections or invited error at trial, the appellate court rejected his claim based on an independent and adequate state rule, and Ground 3 is procedurally defaulted.

Petitioner maintains that Attorney Jones objected to the admission of Hudson's redacted statement numerous times, thereby

22 - OPINION AND ORDER

preserving the issue for appeal.  Petitioner additionally contends that Ground 3, including respondent's waiver argument, was fully and fairly presented to the Oregon courts, and thus is not procedurally defaulted.  Petitioner is correct.

### A. Independent and Adequate State Rule Procedural Default Standards

A state prisoner must exhaust all available state court remedies either on direct appeal or through collateral proceedings before a federal court may consider granting habeas corpus relief. 28 U.S.C. § 2254(b)(1).  A state prisoner satisfies the exhaustion requirement by fairly presenting his claim to the appropriate state courts at all appellate stages afforded under state law.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Casey v. Moore*, 386 F.3d 896, 911 (9th Cir. 2004).

A federal claim is procedurally defaulted if it is actually raised in state court, but explicitly rejected by the court based upon a state law.  *Cone v. Bell*, 556 U.S. 449, 465 (2009); *Coleman v. Thompson*, 510 U.S. 722, 729-30 (1991).  Federal habeas relief is precluded in these cases provided the state law invoked is independent of the federal question and adequate to support the judgment.  *Coleman*, 501 U.S. at 729-30; *Lee v. Kemna*, 534 U.S. 362, 375 (2002); *Sechrest v. Ignacio*, 549 F.3d 789, 802 (9th Cir. 2008).

////

////

////

23 - OPINION AND ORDER

**B.   Pre-trial Objections to Hudson's Statements**

Prior to trial, petitioner through Attorney Jones moved to sever his trial from that of co-defendants Hudson and Ennis.  Resp. Ex. 143.   The prosecution moved to admit redacted versions of Hudson's various statements to police detectives and others.  At a March 30, 2000 pre-trial hearing, Jones opposed the prosecution's motion arguing that if Hudson did not testify, admitting Hudson's statements at a joint trial would violate petitioner's confrontation rights.  Resp. Ex. 109, p. 8-12.

On April 7, 2000, the trial court again addressed the admissibility of Hudson's statements in the context of petitioner's motion to sever.  Attorney Jones argued that separate trials were necessary because he anticipated that co-defendants Hudson and Ennis would make statements that would inculpate petitioner.  Jones also argued that if Hudson's statements were admitted, it would violate petitioner's confrontation rights because it would be impossible for the jury to consider the statements against Hudson only.  April 7, 2000, Tr. 41-42.

On April 11, 2000, the trial court ruled that Hudson's statements were admissible against Hudson only, but deferred ruling on the specific objections to the statements.  Resp. Ex. 143.  On April 17, 2000, Attorney Jones filed a motion *in limine* seeking to exclude any statements made by "Hudson to any party other than the specified redacted version of the one given by

Hudson to police officers that the court has already ruled admissible." Resp. Ex. 109, p. 10.

On April 24, 2000, the first day of trial, Attorney Jones again reiterated petitioner's position, arguing to the trial court:

> MR. JONES: And I still object of course to any form of Mr. Hudson's statement coming in to this trial – you know – like we explained before. And I certainly won't go through all of the arguments, but it's basically the confrontation clause under Article 1, Section 11 of the Oregon Constitution and the 16th [sic] and 14th Amendments to the United States Constitution.
>
> However, with that being said, I know that the Court has ruled that those statements [of the police officers] will come in in a redacted version. The Court, I assume, is going to rule that certain statements of other people will come in. Mr. Hollander [assistant district attorney] has made clear that he does have that intent and today handed us his proposed redacted version of Mr. Hudson's statements to others other than to the officers in this case. So at some point in time we should probably go over those redacted versions. I know we went over and agreed on the redacted version of Hudson's statements to officers. At some point in time, we need to discuss –
>
> So I guess Number 5 should be deferred I guess is what I'm trying to say. Does that make any sense?
>
> THE COURT: Yeah. I think I've decided part of it, as you've indicated, that I've overruled your objection to the admission of Hudson's statements. We spent a considerable amount of time – we went up to 5:00 working on Friday, working on the redacted statements to Stoelk, Graham, and Rawlins.
>
> And, I don't know if you want to go through – is there anything more you want to say about those? I know you object to them coming in at all. Are there any other objections you want to state with regard to the modifications we made on those?
>
> . . . .

25 - OPINION AND ORDER

MR. JONES:    The only thing is I wanted to put on the
record that we have agreed – I think we should put this
on the record in all fairness to the State as well.    This
redacted version of Hudson's statements to the police
officers does reference – has been expanded, and it has
been expanded – and I know the District Attorney spent a
lot of time taking out specific references to other
people in relation to *Humphreys* [sic] and *Taylor* I think
were the two state cases.    We have now agreed – at least
[petitioner] has agreed that, since the court is going to
allow in the statement to allow, at [the prosecution's
request] references to other people being there, that is
not inconsistent with the theory of defense that we've
been required to take because of the Court's ruling, and
so we have agreed to allow references to other persons
whether or not that would have been allowed under the
*[Hu]mphrey* and *Taylor*[2] standard, your honor.

April 24, 2000, Tr. 8-10.

### C.    Arguments Not Procedurally Defaulted

Respondent now contends that petitioner's claims were rejected

by the Oregon Court of Appeals by an independent and adequate state

rule.[3]    Respondent argues that petitioner waived his current

Confrontation Clause arguments by agreeing to the form of the

redactions at trial, and his claims are "unpreserved."    Respondent

argues    that    in    rejecting    petitioner's    Confrontation    Clause

arguments, the Court of Appeals must have applied Rule 5.45(1), and

therefore,    these    arguments    are    procedurally    defaulted.    *See*

Or.R.App.P.    5.45(1)("[n]o    matter    claimed    as    error    will    be

---

[2]Attorney Jones refers to *State v. Umphrey*, 100 Or. App.
433, 786 P.2d 1279 (1990), and *State v. Taylor*, 125 Or. App. 636,
866 P.2d 504 (1993), Oregon cases applying the standard set forth
in *Bruton* and *Richardson*.

[3]Respondent does not contend that petitioner's claims were
not fairly presented.

26 – OPINION AND ORDER

considered on appeal unless the claim of error was preserved in the lower court ... provided that the appellate court may consider an error of law apparent on the face of the record."). Alternatively, respondent argues that by agreeing to the specific redactions, Jones "invited error" in the trial court, and that his claims on appeal were not considered on the merits and thus are procedurally defaulted.  I disagree for several reasons.

First, as detailed above, Attorney Jones challenged the admissibility of the statements on Confrontation Clause grounds at nearly every opportunity prior to trial.  Given these numerous objections by counsel on the record, I cannot conclude that Jones's reluctant agreement to the redactions can be interpreted as a wholesale waiver of petitioner's confrontation rights.  Therefore, I find this case on this record unlike other cases upon which respondent relies where a defendant stipulated to the admission of evidence at trial, and later challenged that evidence on appeal. *See, e.g.*, *Steffler v. Belleque*, Case No. 3:09-cv-1371-MA, 2013 WL 182873, *2 (D. Or. 2013)(finding Confrontation Clause claim procedurally defaulted where petitioner stipulated to admission of evidence at trial and subsequently raised the issue on direct appeal as plain error).

Second, and more importantly, the Oregon Court of Appeals did not *expressly invoke* a procedural bar when denying petitioner's direct appeal.  To be sure, unless the state court "expressly (not

implicitly)" provides that it is relying upon a state procedural
bar, this court must "construe an ambiguous state court response as
acting on the merits of a claim, if such a construction is
plausible." *Chambers v. McDaniel,* 549 F.3d 1191, 1197 (9th Cir.
2008); *Harris v. Reed,* 489 U.S. 255, 266 (1989); *accord Smith v.
Oregon Board of Parol and Post-Prison Supervision,* 736 F.3d 857,
860 (9th Cir. 2013).    Here, in petitioner's opening brief, he
challenged the admission of Hudson's statements under the
Confrontation Clause.    Resp. Ex. 109.    In response, the State
contended that petitioner failed to preserve any objection to the
form of Hudson's statements at trial by agreeing to the redactions.
Resp. Ex. 111, p. 14-19.    The Oregon Court of Appeals affirmed this
portion of petitioner's appeal without discussion. *Benson,* 187 Or.
App. at 277.    Based on the Oregon court's failure to invoke a
procedural bar, I must presume the court rejected petitioner's
claims on the merits. *Coleman,* 501 U.S. at 736; *Johnson v.
Williams,* 133 S. Ct. 1088, 1096 (2013)("[w]hen a state court
rejects a federal claim without expressly addressing that claim, a
federal habeas court must presume that the federal claim was
adjudicated on the merits"); *Valerio v. Crawford,* 306 F.3d 742, 773
(9th Cir. 2002)("The rule must be actually relied on in the
particular case in question.").

Third, respondent's invited error doctrine argument is without
merit.    Contrary to respondent's contention, the Ninth Circuit has

construed a state's common law "invited error" rule similar to other state procedural bars. *Leavitt v. Arave*, 383 F.3d 809, 832-33 (9th Cir. 2004)("There is no reason that we should treat the invited error rule differently from other state procedural bars."). Again, the Oregon Court of Appeals did not explicitly invoke the invited error doctrine as a basis for rejecting petitioner's claims, and thus I must presume the court acted on the merits. *Harris*, 489 U.S. at 261-62 (unless a state court expressly relied on a state procedural bar, it is presumed to have acted on the merits).

Therefore, because the Oregon Court of Appeals did not actually rely on either Rule 5.45(1) or the invited error doctrine as procedural bars to petitioner's direct appeal, I presume the court denied his Confrontation Clause claims on the merits. Accordingly, petitioner has exhausted Ground 3 and it is not procedurally defaulted.

## III. **Merits Ground 3, Subparts (1) through (4)**

Petitioner contends that the admission of Hudson's statements through the testimony of Detectives Stoelk, Quakenbush, and Rawlins, as well as witnesses Morgan and Jacobs, violated his right to confront adverse witnesses and was an unreasonable application of *Bruton v. United States*, 391 U.S. 123, 126 (1968), and *Gray v. Maryland*, 523 U.S. 185, 192 (1998). Petitioner also argues that the admission of non-testifying co-defendant Hudson's statement to

29 - OPINION AND ORDER

Silsby, admitted through the testimony of Detective Graham, was an unreasonable application of *Ohio v. Roberts*, 448 U.S. 56 (1980), and *Lilly v. Virginia*, 527 U.S. 116 (1999)(plurality), because the statements did not fall into any firmly rooted exception to the hearsay rule.

Respondent contends that Hudson's statements to Detectives Stoelk, Quakenbush, and Rawlins comply with *Bruton* and its progeny and therefore, the state court's rejection of petitioner's claims was not an unreasonable application of clearly established federal law.  Respondent further contends that *Roberts* is no longer good law and does not apply.  Respondent argues that this court should apply *Crawford v. Washington*, 541 U.S. 36 (2004), which overruled *Roberts*, and that Hudson's statements to Silsby, Morgan and Jacobs are not "testimonial," and the Confrontation Clause does not apply to their statements.  Finally, respondent argues that even if a Constitutional violation occurred, it did not have a substantial injurious effect on the jury.

## A.    Hudson's Redacted Statements to Detectives Stoelk, Quakenbush and Rawlins

In all criminal prosecutions, the accused has the right to be "confronted with the witnesses against him."  U.S. Const. amend. VI.  "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary

proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990); *Forn v. Hornung*, 343 F.3d 990, 995 (9th Cir. 2003).

The Confrontation Clause may be violated when statements made by a non-testifying co-defendant are proffered as evidence if such statements directly implicate another defendant who has not, or will not, have the opportunity to cross-examine the co-defendant regarding the statement. *Bruton*, 391 U.S. at 126. The *Bruton* rule applies even if the jury is instructed to consider the non-testifying co-defendant's statements only against that co-defendant. *Id.* at 136.

In *Richardson v. Marsh*, the Supreme Court limited *Bruton*. 481 U.S. 200, 208 (1987). In *Richardson,* defendants Marsh and Williams were tried jointly for murder, robbery and assault. In a confession, Williams described a conversation in which Williams and Martin discussed plans to rob and kill the victims. All references to Marsh were redacted from Williams' statement. During Marsh's trial testimony, she admitted to being present during Williams' conversation with Martin. Marsh was convicted of two counts of felony murder and assault. On appeal, the Supreme Court held that the Confrontation Clause is not violated by the admission of a non-testifying co-defendant's confession with a proper limiting instruction, if "the confession is redacted to eliminate any reference not only to the defendant's name, but any reference to

his or her existence." *Id.* at 211.   The *Richardson* court concluded that Williams's confession only implicated Marsh when linked with evidence introduced later at trial, and therefore, no *Bruton* violation occurred.   *Id.* at 208.

In *Gray v. Maryland*, the Supreme Court addressed the admission of a non-testifying co-defendant's confession where the defendant's name was replaced with the word "deleted" or a blank space.   523 U.S. 185, 192 (1998).   There, the Court noted the redacted confession "involve statements that, despite redaction, obviously refer to someone, often obviously to the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.* at 1157.   The *Gray* Court held that, "considered as a class, redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton's* unredacted confessions as to warrant the same legal results." *Id.* at 195.

Therefore, under these cases, clearly established federal law provides that admission of a non-testifying co-defendant's confession at a joint trial violates the Confrontation Clause if the confession facially, expressly, clearly or powerfully incriminates petitioner. *Bruton*, 391 U.S. at 126; *United States v. Angwin*, 271 F.3d 786, 796 (9th Cir. 2001), *overruled on other grounds United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007).

### B. Stoelk and Quakenbush's Statements Do Not Comport with *Bruton* and Progeny

According to petitioner, Detective Stoelk's testimony directly implicated petitioner by name and was so powerfully incriminating that the jurors could not be expected to follow the instructions to ignore it as to petitioner. Additionally, petitioner maintains that based on the redacted confessions themselves, the jury would readily conclude that one of the "other persons" was petitioner. Petitioner argues that the redactions using such pronouns were awkward and insufficient and violate *Bruton*, *Richardson* and *Gray*.

Respondent contends that none of Hudson's statements run afoul of *Bruton*. Respondent maintains that Detective Stoelk's testimony did not directly implicate petitioner because it also identified several others by name that the jurors could have inferred were the "others" involved. Additionally, respondent argues the redactions were consistent with *Richardson* because they used neutral terms such as "others," "they," and "one of the others" and that petitioner's identity could only be learned through other later, properly admitted evidence.

As detailed fully above, Hudson's statement to Detective Stoelk clearly implicated Hudson as a participant in the events on October 28, 1998 that led to Murphy's death. Hudson's redacted statement directly referenced petitioner by name, noting that Hudson had recently met petitioner. The statement also identified

Ennis by name, indicating that Hudson had known Ennis since high school and considered Ennis a friend. The remainder of the statement read by Stoelk referred to Hudson's co-participants in the crimes as "they," "one of the others," and "the other person." According to respondent, standing alone, none of Hudson's redacted statements connected petitioner to the conduct that occurred at Murphy's home.

While Hudson's statement as read by Detective Stoelk identifies four persons (Silsby, Morgan, Robyn and Anthony) in addition to petitioner and co-defendant Ennis, when read as a whole, the four are clearly Hudson's roommates. Additionally, although the statement says that Anthony went outside, only Hudson got in the car and went to Waremart, leaving only petitioner and co-defendant Ennis as the potential "other persons." There is no reason that petitioner and Ennis would have been included in the statement read by Stoelk but for the suggestion that petitioner was, in fact, one of the "other persons" who assisted Hudson with carrying out the crimes. Therefore, I conclude that Hudson's statement read by Stoelk in which petitioner is identified by name as knowing Hudson, when read in the context of Hudson's entire redacted statement, clearly, expressly, and powerfully implicates petitioner in Murphy's felony murder. Therefore, the statement as presented by Stoelk violated petitioner's confrontation rights as

guaranteed by the Sixth Amendment.[4]  *Bruton*, 391 U.S. at 135-36.
See also *United States v. Gillam*, 167 F.3d 1273, 1277 (9th Cir.
1999)(finding *Bruton* error where redaction that replaced co-
defendant's name with readily identifiable information pointing to
defendant); *United States v. Taylor*, 745 F.3d 15, 29 (2d Cir.
2014)(finding *Bruton* error where co-defendant's confession mentions
defendant and awkward redactions pointed to defendant).

I similarly reject respondent's contention that the neutral
pronouns used in redacting Hudson's statement as presented by
Detective Quakenbush comports with clearly established federal law.
Hudson's statement to Detective Quakenbush included the phrase "me
and the two others returned to the Quality Inn," which is akin to
the unconstitutional statement in *Gray*, "Me, _____, _____, and a
few other guys."  *Gray*, 523 U.S. at 192.  I conclude that the
redacted statement read by Quakenbush clearly refers to
petitioner's existence and his identity could readily and obviously

---

[4]Co-defendant Ennis appealed his conviction, and the Oregon
Court of Appeals affirmed without opinion.  *State v. Ennis*, 212
Or. App. 240, 158 P.3d 510 (2007).  However, his appeal was held
in abeyance pending resolution of *Crawford v. Washington.*  In
*Ennis*, the Oregon Court of Appeals examined the exact redactions
at issue in petitioner's case in light of *Crawford*.  In that
case, the court determined that under *Crawford*, the Confrontation
Clause did not apply to Hudson's statements to Silsby, Morgan and
Jacobs.  The court also concluded that the admission of Detective
Stoelk's redacted statement violated Ennis's Confrontation Clause
rights as explained in *Crawford* and that the error was not
harmless. *Ennis*, 212 Or. App. at 260, 263-64.

be inferred.  Thus, I conclude the admission of Hudson's statement read by Quakenbush violated his right to confront adverse witnesses as set forth in *Gray*.

Conversely, I conclude that Hudson's redacted statement as read by Detective Rawlins does not pose the same Constitutional infirmities.  To be sure, the statement read by Rawlins was redacted to eliminate any reference to petitioner, as well as any reference to petitioner's existence.  Although the statement read by Rawlins contained one reference to "they," the statement when read as a whole would not lead a juror to conclude that "they" referred to petitioner.  Therefore, I conclude the statement read by Rawlins comported with *Bruton, Richardson* and *Gray*.[5]

### C.    Hudson's Redacted Statements to Silsby, Morgan and Jacobs

As discussed above, Stephanie Silsby, Hudson's girlfriend, was living with Hudson at the time of Murphy's death.  Some time after the events on October 28, 1998, Hudson returned to their residence and made statements to Silsby that inclupated petitioner.  Silsby was interviewed by Detective Graham in February 1999, and Silsby relayed Hudson's statements to Graham.  At trial, after Silsby testified that she had no independent recollection of her statement to Graham, the trial court permitted Graham to read Silsby's

---

[5]I note that on direct appeal, petitioner argued that the trial court erred in admitting Rawlins' statement, but that Rawlins's statement "was not of significance."  Resp. Ex. 109, p. 10, n.1.

statement about what Hudson told her as a recorded recollection under Or.R.Evid. 803(5). Tr. 866-67. Also at trial, Jonathan Morgan, Hudson's roommate, read a redacted version of a statement he gave to police regarding Hudson's statements to him that inculpated petitioner. Tr. 644. Joseph Jacobs read into evidence a statement he provided to Detective Quakenbush about what Hudson told Jacobs inculpating petitioner when Jacobs and Hudson shared a cell at county jail. Tr. 783-84.

The parties dispute whether *Ohio v. Roberts* or *Crawford v. Washington* applies to Hudson's statements to Silsby, Morgan and Jacobs. I conclude that it is unnecessary to resolve whether *Crawford* or *Roberts* applies to Hudson's statements to his girlfriend, roommate and cellmate because even if those statements were erroneously admitted or insufficiently redacted, they did not have a substantial and injurious effect on the jury's verdict.

## IV.  **Harmless Error Analysis**

A Confrontation Clause violation is subject to harmless error analysis. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011); *see Delaware v. Van Arsdall*, 475 U.S. 673, 681-84 (1986). Habeas relief is proper only if any error by the state courts "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. In evaluating whether a Confrontation Clause

violation had a substantial and injurious effect, the court considers a number of factors, including:

> "the importance of the testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case."

*Ocampo*, 649 F.3d at 1114 (quoting *Welchel v. Washington*, 232 F.3d 1197, 1206 (9th Cir. 2000)); *accord Van Arsdall*, 475 U.S. at 684. If the court has grave doubts about whether the Constitutional error was harmless, that doubt must be resolved in petitioner's favor. *Ortiz v. Yates*, 704 F.3d 1026, 1038 (9th Cir. 2012); *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

Petitioner argues that Hudson's statements to Silsby that petitioner and co-defendants went to Murphy's home to "tax" Murphy were central to the prosecution's theory. Additionally, petitioner argues that through Hudson's statements to Detective Stoelk, the jury learned that petitioner attempted to shoot Murphy with a crossbow, thereby erroneously victimizing Murphy and undermining petitioner's self-defense theory. Petitioner argues that absent Hudson's redacted statements, the state was left only with Perrotte's testimony, whom petitioner contends was of suspect credibility. I disagree.

Upon a careful review of the entire record, I conclude that even if Hudson's statements to Detectives Stoelk and Quakenbush, and Silsby, Morgan and Jacobs were excluded, ample evidence

supported the jury's finding of guilt on felony murder. First, petitioner testified at trial and admitted to shooting Murphy, but contended that he did so in self-defense and that he and co-defendants Ennis and Hudson only took Ennis's property. As detailed above, Perrotte's testimony wholly undermined petitioner's version of events. To be sure, Perrotte testified that petitioner confronted Murphy and was looking for an apology, that petitioner attempted to shoot Murphy with the crossbow, that it sounded like Murphy was getting roughed up inside the house, that Murphy was duct-taped before he landed in the garage, and that petitioner and co-defendants were armed. According to Perrotte's testimony, while petitioner was beating Murphy, co-defendants Ennis and Hudson were loading Murphy's property into the U-Haul. More convincingly, the state presented evidence from other witnesses who corroborated key pieces of Perrotte's testimony.

For example, Christine Wilson testified that petitioner returned to the Quality Inn after shooting Murphy with an injured finger from a crossbow, which confirmed Perrotte's testimony that petitioner attempted to shoot Murphy with the crossbow. Wilson's testimony was contrary to petitioner's testimony that he simply "tapped" Murphy on the chest with the crossbow.

Moreover, petitioner's own testimony undermined his theory that he shot Murphy in self-defense. Petitioner admitted that he was armed when he went to Murphy's home. At trial, petitioner also

admitted that he attempted to get Murphy to apologize for the statements made to Ennis's girlfriend, and that when Murphy refused, he "tapped" Murphy with the crossbow then broke a phone on a shelf next to Murphy's head. Petitioner dubiously contended that Murphy then asked petitioner go inside the house with Murphy.  Tr. 1377.  Petitioner admitted that after some pushing and shoving, he hit Murphy so hard that Murphy crashed over a stove and landed in the garage. Thus, petitioner's own testimony conflicts with his contention that it was Hudson's statement through Detective Stoelk that victimized Murphy.

Petitioner's explanation of the remainder of the events on the night he shot Murphy is even more implausible. For example, petitioner's testimony that Murphy asked petitioner to use duct tape to stop the bleeding on his forehead was unbelievable. If, as petitioner claimed, the altercation between he and Murphy had calmed down, permitting Murphy himself to attend to his wounds would be more rational. Similarly, petitioner's contention that after he duct-taped Murphy's head, Murphy asked petitioner to go back inside to talk further to "work things out" is improbable.

Furthermore, the jury could readily infer from petitioner's actions after the shooting that he did not shoot Murphy in self-defense.  To be sure, petitioner admitted at trial that he went to the Quality Inn and immediately changed his clothes, and instructed Hudson and Ennis to do the same.  Petitioner also admitted that he

put all the clothing into a duffel bag, and that he did not call for an ambulance or report Murphy to the police. The prosecution presented testimony from Wilson confirming that petitioner, Ennis and Hudson indeed changed clothes. To be sure, because petitioner admitted that after shooting Murphy, he returned to the Quality Inn with Ennis and Hudson, the admission of Hudson's statement through Detective Quakenbush clearly was harmless.

Additionally, police officers Gray and Siebel testified that while investigating a wholly unrelated complaint of suspected drug activity at the Quality Inn, petitioner specifically negotiated the release of his leather jacket and the contents of his car on the day of Murphy's death, including the clothing-stuffed duffel bag. And, Wilson confirmed that petitioner asked her to clean his leather jacket, and that she saw blood on the jacket. The leather jacket was eventually located by investigators and DNA testing matched positively for Murphy's blood. Petitioner's mother, Patricia Temple, testified that petitioner's belongings that she retrieved included clothing that did not fit petitioner. From this evidence, the jury could readily infer that petitioner's actions after shooting Murphy were inconsistent with his self-defense theory.

The prosecution also presented evidence independent of Hudson's redacted statements that supported Perrotte's testimony and undermined petitioner's position that he did not steal property

from Murphy's home.   The prosecution presented evidence from numerous witnesses, including testimony from Geigle, Prince, and Rohrback, about petitioner and his co-defendants moving, storing, and selling assorted items identified by Perrotte as Murphy's, including a safe and tools.   From this testimony, the jury could readily infer that petitioner stole Murphy's property.   Thus, petitioner's contention that the prosecution's theory of the case and evidence of intent was based entirely on Hudson's statement to Silsby is simply not supported by the record.

Petitioner's contention that because Perrotte admitted to using methamphetamine on the night of Murphy's death, and admitted to lying to the police in his initial interviews, Perrotte's testimony is suspect.   Admittedly, Perrotte was a flawed witness. Yet, petitioner also suffered credibility problems; petitioner admitted to using methamphetamine on the night of Murphy's death. Tr. 1352.   Additionally, Perrotte was extensively cross examined and he explained that he lied to police because he feared for his own safety and that of his family.   And, Perrotte's version of events was corroborated by multiple other witnesses and evidence. Furthermore, the evidence concerning the efforts petitioner made to move, store, and sell the property taken from Murphy's home was extensive.   *See Mayes v. Premo*, 766 F.3d 949, 965 (9th Cir. 2014), *cert. denied,* 135 S. Ct. 978 (2015) (finding that admission of

hearsay statement, in light of other trial evidence did not have substantial injurious effect or influence on jury's verdict).

Finally, Hudson's statements admitted through Silsby, Morgan and Jacobs did not likely tip the scales for the prosecution against petitioner. The most damaging statements from Silsby, Morgan and Jacobs concerned petitioner duct-taping Murphy and attempting to shoot Murphy with the crossbow, evidence that was refuted by not only Perrotte's testimony, but also by Wilson's testimony. And, as noted above, petitioner's explanation about using the duct tape to staunch Murphy's bleeding head was completely implausible. I disagree with petitioner that because the prosecution mentioned the word "tax" in its opening and closing statement that Hudson's statement to Silsby was key to the state's theory. To be sure, petitioner admitted in his testimony that he attempted to get Murphy to apologize about the offensive statements to Ennis's girlfriend and Ennis admitted to selling Murphy methamphetamine on numerous occasions.

Given the ample evidence against petitioner and the paucity of evidence supporting petitioner's contention that he shot Murphy in self-defense, I have no doubt that the error in admitting Hudson's redacted statements was harmless.

As the evidence in the record makes clear, even in the absence of Hudson's redacted statements, the record contained compelling evidence that petitioner committed the crimes for which the jury

found him guilty.    As such, Hudson's statements did not have a substantial injurious effect or influence in determining the jury's verdict.    *Brecht*, 507 U.S. at 637; *Mayes*, 766 F.3d at 966. Accordingly, the state court's rejection of petitioner's Confrontation Clause claims was not contrary to, nor an unreasonable application, of clearly established federal law.

## CONCLUSION

For the reasons stated above, the Petition for Writ of Habeas Corpus (#1) is DENIED and this proceeding is DISMISSED.    Because petitioner has made a substantial showing of the denial of a constitutional right, a certificate of appealability is GRANTED as to Ground 3, subparts (1-4)(Confrontation Clause of the Sixth Amendment) is GRANTED.

IT IS SO ORDERED.

DATED this ___X___ day of JUNE, 2015.


*Malcolm F Marsh*
Malcolm F. Marsh
United States District Judge

44 - OPINION AND ORDER